**CATHBAKE INVESTMENT COMPANY, INC., Plaintiff-Appellee,**

v.

**FISK ELECTRIC COMPANY, INC., Defendant-Appellant.**

No. 81-7752.

United States Court of Appeals, Eleventh Circuit.

March 14, 1983.

Bradley, Arant, Rose & White, Dewey W. Hammond, III, Birmingham, Ala., Bracewell & Patterson, Michael A. Caddell, Houston, Tex., for defendant-appellant.

Denaburg, Schoel, Meyerson & Ogle, Richard F. Ogle, Birmingham, Ala., for plaintiff-appellee.

Before KRAVITCH, HATCHETT and CLARK, Circuit Judges.

---

CLARK, Circuit Judge:

Appellant Fisk Electric Company, Inc. ("Fisk"), a Texas corporation, organized a wholly-owned subsidiary, Dyer Electric Company, Inc. ("Dyer"), under the laws of Alabama in 1972. From May 1972, until December 31, 1977, Fisk, together with Dyer and its other wholly-owned subsidiaries, filed consolidated federal income tax returns. At all times applicable, both Fisk and Dyer were on the calendar year basis for tax reporting purposes.

In connection with the filing of Fisk's consolidated income tax return, it was Fisk's practice to have the estimated tax credit or debit attributable to each of its subsidiaries, including Dyer, handled as follows: If the subsidiary's operations resulted in taxable net income, then 50% of such amount (an approximation of the applicable corporate income tax rate) was entered on the subsidiary's books as an account payable and on Fisk's books as a receivable; if the subsidiary's operations resulted in a net loss, then 50% of such loss was entered on the subsidiary's books as a receivable and on Fisk's books as an account payable.

On August 31, 1978, Dyer ceased to be a wholly-owned subsidiary of Fisk pursuant to a Stock Purchase Agreement in which appellant Fisk agreed to sell to appellee Cathbake Investment Co., Inc. ("Cathbake") all of the issued and outstanding shares of stock of Dyer. The agreement was prepared by a Birmingham, Alabama, law firm and the fees for this work were shared equally by Fisk and Cathbake.

Article 9.4 of the agreement, the article relevant to the present matter, provided as follows:

The parties to this Agreement recognize that there are certain inter-company accounts between Seller [Fisk] and the Corporation [Dyer]. At the closing, or as soon as practicable thereafter, Seller and the Corporation will clear these inter-company accounts, with each party paying to the other party all amounts due from inter-company transactions.

At or shortly after the closing, Fisk, pursuant to the above article, issued Dyer a check for $802,232.45, which Dyer accepted. Included in this amount was the net amount due from Dyer to Fisk for the tax years prior to 1978, calculated according to the procedure for consolidated tax returns described above.

During the period from January 1, 1978, through August 31, 1978, Dyer incurred a net operating loss of $150,917. Pursuant to the Internal Revenue Code and Regulations, Fisk reported this loss in its 1978 consolidated income tax return, which it filed in 1979. Inclusion of this loss reduced Fisk's taxable income for the tax year ending 1978 and thus Fisk's tax liability for 1978.

At trial, appellee Cathbake, Dyer's purchaser, contended that Article 9.4 of the Stock Purchase Agreement obligated appellant Fisk to pay appellee approximately $75,000, or half the net operating loss Dyer incurred, because Fisk had included Dyer's 1978 tax loss on its 1978 consolidated return. This amount was calculated pursuant to Fisk's usual manner of treating subsidiaries' ordinary tax losses. Fisk contended at trial that the meaning of Article 9.4 was unclear, requiring the introduction of evidence of negotiations regarding inter-company accounts. Fisk argued that the article dealt with certain existing accounts between Dyer and Fisk as of the date of the closing of the sale, and these accounts were cleared by Fisk's payment to Dyer of the $802,232.45, which included amounts in the inter-company tax accounts for years prior to 1978.

Before making its findings, the district court concluded that the language of Article 9.4 was "clear" and "unambiguous"; the district court determined that no parol evidence was needed to determine the intention of the parties as to the meaning of the article. On this basis, the court refused admission of various testimony and documents which apparently would have illuminated the negotiated meaning of Article 9.4.

Having reached the conclusion that the article was unambiguous, the district court

determined that the pivotal issue was whether the 1978 loss would fall within "inter-company accounts," as that term is used in Article 9.4. In concluding that the 1978 tax loss would fall within an "inter-company account," the district court first noted the usual treatment by Fisk of its subsidiaries' losses, and then noted that the Stock Purchase Agreement contained no provision explicitly altering this treatment insofar as Dyer's losses were concerned (R. 145). The court then found that Fisk's records showed that Fisk's accountants in March 1979, had treated Dyer's operating loss as an account payable to Dyer, in conformity with practice prior to Fisk's sale of Dyer, and had suggested that Dyer treat the loss as an account receivable from Fisk. Finally, the court concluded that, although Article 9.4 called for the clearing of the inter-company accounts "as soon as practicable" after the closing, the earliest practicable time for computing the loss of income was the time of filing the returns, March or April of 1979, six months after the closing. On the basis of these findings, the district court concluded that appellant Fisk breached Article 9.4 and that appellee Cathbake, Dyer's purchaser, was entitled to damages of $75,458.50, or half $150,917.00, plus interest.

At issue on appeal is the question of whether Article 9.4 was clear and unambiguous, as the district court concluded during trial, and whether extrinsic evidence should have been admitted to elucidate the article's meaning. Fisk asserts that the parties, during negotiations of the Stock Purchase Agreement, neither discussed nor contemplated any anticipated tax credits or liabilities for the first eight months of 1978; that the parties did not contemplate that Dyer's 1978 tax loss would relate to the term "inter-company accounts"; that representatives of Fisk and Cathbake agreed during the negotiations to the amounts of the "inter-company accounts." Fisk asserts further that these agreed-upon amounts did not include an amount for Dyer's 1978 tax performance.

Whether a writing is ambiguous is a question of law for the court. *Medical Clinic Bd., etc. v. Smelley,* 408 So.2d 1203, 1206 (Ala.1981); *Mass Appraisal Services, Inc. v. Carmichael,* 404 So.2d 666, 673 (Ala. 1981). A question of law is subject to plenary review before this court. *Suburban Realty Company v. United States,* 615 F.2d 171 (5th Cir.1980).

"A latent ambiguity arises when the writing on its face appears clear and unambiguous, but there is some collateral matter which makes the meaning uncertain." *Gibson v. Anderson,* 265 Ala. 553, 92 So.2d 692, 694 (Ala.1957). "It is well established that parol or other extrinsic evidence is admissible to explain or clarify a latent ambiguity." 92 So.2d at 692; *Mass Appraisals Services, Inc. v. Carmichael,* 404 So.2d 666, 672 (Ala.1981); *Medical Clinic Bd., etc. v. Smelley,* 408 So.2d 1203, 1206 (Ala.1981). For this court to resolve the question of law of whether latent ambiguity exists in Article 9.4, it must necessarily examine extrinsic evidence. "Such evidence is received, not for the purpose of importing into the writing an intention not expressed therein, but simply with the intention of elucidating the meaning of the words employed." *Gibson v. Anderson,* 90 So.2d at 694. Given Alabama's recognition of latent ambiguity, a trial court must be alert to the possibility of such ambiguity.[1]

Despite the district court's restraints on such evidence, the record contains much evidence of the ambiguity of Article 9.4. Mr. Leroy Barber, an officer of both Dyer and Cathbake, a participant in the negotiations for the sale of Dyer to Cathbake, and

---

1. The Restatement (Second) of Contracts sec. 212 comment b (1979) is instructive on this point:

It is sometimes said that extrinsic evidence cannot change the plain meaning of writing, but meaning can almost never be plain except in a context.... Any determination of meaning or ambiguity should only be made in the light of relevant evidence of the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties.

a witness at the trial, prepared a document important to this case labeled Defendant's Exhibit No. 1. This document was prepared in conjunction with Mr. Barber's negotiations with Mr. Chenault, a principal of Cathbake, as to the balances of the inter-company accounts. (R. 106, lines 17–22). Defendant's Exhibit No. 1 indicates that there were indeed express negotiations of specific inter-company accounts.

The second page of the exhibit shows the following:

INTER COMPANY

| | | | |
|---|---|---:|---|
| 1977 Federal Taxes | (Dyer Owes Fisk) | 28,870.55 | (1) |
| 1976 Loan | (Dyer Owes Fisk) | 75,000.00 | (2) |
| 1977 Loan | (Dyer Owes Fisk) | 100,000.00 | (3) |
| 1976 Interest | (Dyer Owes Fisk) | 750.00 | (4) |
| 1977 Interest | (Fisk Owes Dyer) | − 1,871.23 | (5) |
| 1976 Federal Taxes | (Fisk Owes Dyer) | −112,500.00 | (6) |
| A/R On Joint Line Job | (Fisk Owes Dyer) | − 3,962.63 | (7) |
| | 12/31/77 | 86,286.69 | |
| 6/19 Wired | | 160,000.00 | |
| 6/23 Deducted From Fisk Ck | | −160,000.00 | |
| 7/17 Wired | | 282,733.81 | |
| Kept Check | | −282,733.81 | |
| 8/3 Wired | | 100,000.00 | |
| 8/14 Wired | | 325,000.00 | |
| 8/21 Wired | | 100,000.00 | |
| 8/21 Deducted From Fisk Ck | | −232,000.00 | |
| Deducted From Fisk Ck | | −100,000.00 | 193,000.00 (8) |
| | | 279,286.69 | |
| Less Advanced to Jerry Evans 9/77 | | − 300.00 | (9) |
| | | 278,986.69 | |

In the left-hand margin of the page showing the information above, the date "12/31/77" is written alongside the first group of seven lines. In the margin beside the second group of lines appears—though not entirely readable—the word "current." On this exhibit page headed "INTER COMPANY," neither the first group of items showing 1976 and 1977 taxes, nor the second group showing certain apparently "current" items, includes the taxes accrued from January 1978, through August 1978.

Mr. Huner, Dyer's outside accountant and an expert witness at the trial, testified, "Mr. Barber, to the best of my recollection, prepared a schedule indicating what those inter-company balances were relative to cost and payments back and forth between the companies and other balances." (R. 55).

On page one of this same Defendant's Exhibit No. 1 are the following lines:

| | | |
|---|---|---:|
| (1) Cost On Joint Ventures 8/25/78 | | 4,794,604.00 |
| Less Receipts | | − 3,708,001.00 |
| | | 1,086,603.00 |
| Less Inter-Company Balances | | − 284,370.55 |
| (2) (Items #1, #2, #3, #6 & #8 | | |
| Fisk Check #1 | | 802,232.45 |
| Fisk Check #2 (Earned Profit) | | 110,000.00 |
| Ck to Fisk | | 303,000.00 |
| Ck to Bank | | 650,000.00 |

(1) Cost After This Date Wired to Dyer Account

(2) Items #4, #5, #7 & #9 To Be Resolved Later ($5,083.86)

Mr. Barber averred at trial to calculations performed by Fisk's attorney, by which the parenthetical $5,083.86 figure in the last line apparently standing for "Items # 4, # 5, # 7 & # 9 to be resolved later" is added to the $279,286.69 figure from the bottom of the exhibit's page two (set out above) to equal the $284,370.55 figure in the fourth line of page one. That figure in the fourth line is labeled "Inter-Company Balances." This label suggests that the $284,-370.55 figure shows the sum total of "Inter-Company Balances," that the parties intended to settle, and that the $5,083.86 figure was the parties' estimate of inter-company accounts "to be resolved later."

When Mr. Barber was asked at trial whether the $5,083.86 figure represented the only accounts that Mr. Barber and Fisk had not resolved, "items # 4, # 5, # 7 & # 9," Mr. Barber said, "That's the only ones cleared up that we had information on at that time." (R. 109). Nonetheless, because there is no mention of 1978 taxes on either page, there is an implication that those taxes were not contemplated among inter-company accounts by the parties during the negotiations.

Mr. Huner, Cathbake's outside accountant, prepared a document, Defendant's Exhibit No. 5, dated February 2, 1979, which states *Per Leroy* [Barber]—There is no written agreement with regard to Fisk/Dyer income taxes. He believes that they would get credit for Fisk taking the loss August 31, 1979." The first sentence of this quotation suggests that Mr. Barber did not think that Article 9.4 had dealt with the 1978 taxes at issue here, which Huner was considering in 1979. The second sentence states, at best, Mr. Barber's understanding

of the result of the negotiations, which was not incorporated in Article 9.4; the correctness of his understanding can be determined only in light of parol evidence of those negotiations.

The meaning of Article 9.4 is ambiguous in the context of the evidence that slipped through the district court's restrictions. The district court concluded that the article was unambiguous "on its face" (R. 59). Consequently, the court excluded Defendant's Exhibit No. 2; sustained objections to questions put to Mr. Barber (*e.g.*, "There was never any discussion in those negotiations about a tax adjustment at a later date, was there?"); and refused testimony from Mr. Davis, a Fisk principal, and Mr. Henderson, the lawyer who prepared the Stock Purchase Agreement and sent his bill to Cathbake, as to the negotiations. All such evidence should have been admitted.

Cathbake made much of the fact that Fisk's own accountants treated Dyer's 1978 loss as an inter-company account, which Fisk was to treat as a payable and Dyer as a receivable. However, if these were outside accountants devising this treatment months after negotiations in which they had no role, then this fact may not bear on the issue to be decided, given an interpretation of the contract in light of extrinsic evidence. Similarly, the record does not state clearly whether accountants were absent from the negotiations, but there is a strong suggestion of that fact: appellee Cathbake's attorney at oral argument stated that none of the accounting witnesses, who had acted as the parties' accountants, were at the negotiations. Such matters as these should have been illuminated.

REVERSED AND REMANDED.