Harrison **COMBS**, John J. O'Connell and Paul R. Dean, as Trustees of the United Mine Workers of America Health and Retirement Funds, Plaintiffs-Appellees,

v.

**RYAN'S COAL COMPANY, INC.**, a corporation; George M. Simmons; and Alan's Coal Sales, Defendants-Appellants.

Nos. 85–7743, 85–7751.

United States Court of Appeals, Eleventh Circuit.

April 2, 1986.

Rehearing and Rehearing En Banc Denied May 8, 1986.

█

---

William H. Mills, Redden, Mills & Clark, Gerald L. Miller, Birmingham, Ala., for defendants-appellants.

Robert Stropp, Jr., Patrick K. Nakamura, Birmingham, Ala., for plaintiffs-appellees.

Before JOHNSON and HATCHETT, Circuit Judges, and ALAIMO *, Chief District Judge.

JOHNSON, Circuit Judge:

This case requires that we determine the precise scope of a trial court's power to find parties in contempt and to order sanctions in order to secure compliance with that court's orders. It also requires that we determine what constitutes a final, appealable order in the context of contempt citations. For the reasons explained herein, we find that the appeal of the trial court's first order is improperly brought because that order is not final and hence may not be heard on interlocutory appeal. Accordingly, the action docketed as No. 85–7743 is DISMISSED. As to the trial court's two orders of November 25, docketed as No. 85–7751, we AFFIRM in all respects that portion entering a final civil judgment. As to that portion directing that appellant George Simmons be incarcerated, we VACATE AND REMAND for clarification or modification.

## I.

Appellees, Trustees of the United Mine Workers Health and Retirement Funds ["the Trustees" or "the appellees"], filed an action under the Employee Retirement Income Security Act, 29 U.S.C.A. § 1132(g)(2)(E) (1985) ["ERISA"], in 1983 against appellant Ryan's Coal Inc. ["Ryan's"] seeking both legal and equitable relief under a collective bargaining agreement due to Ryan's failure to make scheduled pension fund payments for its employees as required by 29 U.S.C.A. § 1145.

Ultimately appellees and appellant George Simmons ["Simmons"], president and chief executive officer of Ryan's, agreed on a consent decree and order, which was entered on January 14, 1985, awarding the Trustees the desired remedies, including $492,754.91 to be paid in installments with interest, and injunctive relief preventing asset transfers except for

valid and fair consideration. The trial court retained jurisdiction so as to monitor compliance. Ryan's made its January payment and submitted its financial statement as the agreement stipulated. It has made no payments since January and filed no reports since March.

On October 4, 1985, due to Ryan's failure to meet the terms of the consent decree, appellees filed a petition for contempt and a motion for a show cause order. Also named in the petition were appellants Alan's Coal Sales ["Alan's"], Simmons, and Simmons Machinery (another of George Simmons' endeavors). Simmons Machinery is not currently before us. The trial court issued the show cause order on October 10 and set the hearing date for November 8, 1985. Alan's, Simmons Machinery, and Simmons moved to quash or strike all orders. Answers were timely filed. This is the consolidated appeal from two hearings held to enforce the earlier consent decree. To the extent possible, the facts for each are put forth separately.

*November 8 Hearing:*

The key actor in this case is George Simmons. He is president, chief executive officer, and 80% stockholder of Ryan's, a contractor that mines coal from land leased to Alan's, a partnership that retails coal to the public. Ryan's is under contract to sell all of the coal it mines to Alan's. Simmons is a general partner, manager, and majority shareholder in Alan's. He is also president and sole stockholder in Simmons Machinery, and is involved in a number of other ventures.

From their creation until the trouble that led to the consent decree, Alan's and Ryan's were operated as separate businesses, with individual books and accounts, though they were both run out of the same building, where Simmons had his office and headquartered all of his various businesses. Due to audits pursuant to the collective bargaining agreement, this arrangement was generally known to appellees.

---

* Honorable Anthony A. Alaimo, Chief U.S. District Judge for the Southern District of Georgia, sitting by designation.

In March Ryan's ceased production and began winding down its business. It did not make the payment scheduled in the consent decree. It no longer had a bookkeeper, so the responsibility for bookkeeping and the writing of checks was assumed by Alan's. Separate books were maintained, but all of the money was run through Alan's accounts and checks for Ryan's debts were drawn from these accounts. When Ryan's closed in June, the cash balance of over $10,000 was transferred from Ryan's to Alan's account. All of Ryan's receivables were deposited into Alan's accounts. Total cash disbursements by Alan's for Ryan's obligations was $137,000, including employees' paychecks.

At closing, Ryan's had 1985 gross sales of $650,000, negative equity of almost $100,000, and assets of $1,620,000, 90% of which were receivables owed by Alan's. Earlier Alan's had been permitted to execute in favor of Ryan's a seven year promissory note for $1.5 million, interest free, owing to Ryan's for unpaid-for coal sales. At some point within three months prior to closing, Ryan's paid Simmons over $10,000 and paid $50,000 to Simmons Equipment Co., a corporation entirely owned and operated by Simmons.

The hearing on November 8 was to consider the failure to comply with the consent decree entered in January. Simmons Machinery was dismissed as a party. The court further considered whether Alan's or Simmons should be considered the successor and/or *alter ego* of Ryan's for purposes of enforcing the obligations under the January decree.

Simmons testified at the hearing that neither Ryan's nor Alan's had the money to make the required pension fund payments. He further testified that he personally could not pay the required amount. However, he did not provide access to any of the financial records for himself or for Ryan's for 1985. He argued that neither he nor Alan's should be held responsible for Ryan's debts because appellees knew of the close relationship and made no effort to include Simmons or Alan's in the January consent decree.

On November 13, the district court entered an order and findings of fact that Alan's was the successor and that Simmons was the *alter ego* of Ryan's. Alan's and Simmons were held in civil contempt along with Ryan's for failure to abide by the January consent decree. The remedy ordered was compensatory and gave the contemnors the opportunity to purge themselves of contempt prior to a second hearing, ordered for November 22, at which the court would determine compliance with the November 13 order and the amount of costs and fees to be assessed. The three appellants were ordered to pay appellees $226,411.73, to post a surety bond of $500,000 by November 22, and, at the request of the Trustees, to suffer an audit for unpaid pension contributions due for the period since March. Appellees were awarded attorney's and accountant's fees and costs.

*November 22 Hearing:*

Prior to this hearing both sides were to secure several items for the court's consideration. Appellees were directed to prepare and did submit affidavits enumerating costs and fees incurred. Appellants had been ordered to secure the $500,000 surety bond. All three appellants claim that they sought a bond and that all three were unable to secure one, due to their financial circumstances. Appellees maintain that only Ryan's sought the bond.

Despite the court's order, Simmons did not have an audit prepared of himself or of either company. Instead he had his accountant prepare an unverified personal financial statement. The accountant refused to certify the accuracy of that statement because it was inconsistent with Generally Accepted Accounting Principles: the figures were based solely on Simmons' representations, rather than on a standard audit; the accountant had no access to Simmons' current bank records; and the asset valuations were based on liquidation price rather than fair market value. Appellees contend, and the court below found, that this had the effect of significantly undervaluing

Simmons' net worth. Appellees also claim that Ryan's sold coal to Alan's at prices significantly below fair market value.

The record below shows, *inter alia*, that Simmons has 100% ownership of Simmons Equipment Co. (which he claims is not producing a profit), significant holdings or interests in several other enterprises, including Calvert & Marsh Co. and Berry Mountain Mining Co. (the former he claims is insolvent and not operating; the latter he claims to be heavily in debt and about to go under), 2000 acres of land, a cattle farming operation, $800,000 worth of heavy equipment, and a $250,000 home. He also created an irrevocable trust for his children's benefit and loaned it $1 million. He claims that all of these assets are encumbered by various mortgages and collateral arrangements, or are owned jointly with his wife. He offered no independent accounting of his worth, no independent appraisals of the value of his tangible holdings, no recent bank records, no tax return for 1984, incomplete balance statements for some of his businesses, and he failed to reveal a $400,000 note owed him by Berry Mountain Mining.

In light of the failure to provide the information ordered at the November 8 hearing, the trial court on November 25 entered two orders. First, it found bad faith failure to comply with its earlier order. The court entered findings that the November 13 order was not a final order, that Simmons had failed to submit an audited and verified financial statement and had significantly understated his worth, that he had failed to provide financial records for Simmons Equipment and that the court could thus infer that it was viable and profitable. The court found bad faith in Simmons' failure to attempt to meet his obligations under the November 13 order. It also found that, as the *alter ego* of Ryan's, Simmons by his failure to make the required payments demonstrated bad faith in light of his control of Berry Mountain Mining, which had gross receipts of between $2–3 million in the month prior to the hearing. Taken as a whole, the court found that this refuted Simmons' claim of

inability to pay. Accordingly, the court entered a written judgment against all three appellants in the amount of $728,-395.14.

The trial court, having previously adjudged Simmons in civil contempt on November 13, also entered an order that he be incarcerated for 21 days unless he demonstrated a good faith effort to comply with the court's orders.

On November 18, 1985, Ryan's, Simmons, and Alan's filed notice of appeal from the November 13 order and a motion to stay enforcement of the judgment. On November 22, the appellants appealed to this Court the trial court's entry of a final judgment and order of incarceration. On November 27, this Court granted the motion for a stay pending appeal of the trial court's order for the incarceration of Simmons and of its order permitting enforcement of the judgment. We *sua sponte* ordered the two appeals consolidated, and we directed the parties to address in briefs and at oral argument whether the November 13 order was final and hence appealable.

## II.

The issues in this case may be broken down into five questions: A) whether the district court's order of November 13 was a final appealable order; B) whether the consent decree was entered consistent with Fed.R.Civ.P. 65; C) whether the district court improperly resorted to compensatory and coercive contempt remedies; D) whether the trial court properly found Alan's and Simmons shared in Ryan's responsibility for the contumacious conduct; E) whether the trial court properly found that Simmons had the present ability to satisfy the court ordered obligations.

### A. *The November 13 Order:*

We directed both parties to present argument as to whether the trial court's order of November 13 following the November 8 hearing was a final, appealable order. That order made findings of fact and found

all three appellants in civil contempt for failure to fulfill the obligations of the consent decree, although Alan's and Simmons were not technically parties to the agreement between Ryan's and the appellees in January. The trial court ordered appellants to pay to the trustees immediately over $225,000, to post a $500,000 bond, to suffer an audit and to pay any pension fund amounts found owing, and to pay the appellees' fees and costs. That order also directed that another hearing be held on November 22 at which the court would determine the fee award and consider compliance.

■ If the November 13 order was final and appealable then the subsequent hearing on November 22 was effected without jurisdiction and the order then issued is a nullity. If the November 13 order was not final then this Court has no power to hear appellants' complaints regarding the issues raised under No. 85–7743, except to the extent that the November 13 order laid the predicate for the ultimate judgment of the trial court that was entered on November 25. Whether a court order is final and appealable is a question of law and hence is subject to independent review before this Court. *Cathbake Inv. Co. v. Fisk Electric Co.*, 700 F.2d 654, 656 (11th Cir.1983).

■ Generally a finding of civil contempt is not reviewable on interlocutory appeal. The party must wait until a final decree is issued. *Fox v. Capital Co.*, 299 U.S. 105, 107, 57 S.Ct. 57, 58, 81 L.Ed. 67 (1936); *Drummond Co. v. District 20, United Mine Workers*, 598 F.2d 381, 383 (5th Cir.1979). But as we noted in *Drummond*, there are exceptions to this general rule. *Id.* Most relevant to this appeal is the distinction we have drawn between orders imposing a fine or penalty for contempt which may be avoided by the party purging himself of the contempt by complying with the order, and those in which a fine or penalty is imposed within a time certain that may not be avoided by some other form of compliance. The former is not appealable in an interlocutory action; the latter may be taken on appeal immedi-

ately. *Id.* at 384; *Hoffman v. Beer Drivers & Salesmen's Local 888*, 536 F.2d 1268, 1272–73 (9th Cir.1976). The key is whether the contempt penalties imposed are "conditional or subject to modification." 598 F.2d at 384. The goal is to avoid the "risk of disrupting a continuing, orderly course of proceedings below." *Id.*

■ The November 13 order left open several questions to be resolved on the 22d—namely, whether appellants had paid roughly one third of the amount due and posted the balance in the bond, whether additional contributions were due for the period since March (the point at which Ryan's had stopped making payments to the pension fund a second time), the determination of costs and fees to be paid by appellants, and whether appellees had provided the required accountings and audits in order to determine the ability to pay of Alan's and Simmons.

The November 13 order was merely interim and clearly conditioned on the submission of a substantial quantum of information at the second hearing before a final finding of civil contempt would be issued, if at all. This would depend on whether appellants purged themselves by good-faith compliance during the two-week interim. Appellate review of the November 13 order would be disruptive of what was obviously a continuing effort on the part of the district court to prod the appellants into compliance while avoiding making a final finding of contempt if possible.

Appellants attempt to escape this general rule in three ways. First, they argue that it applies only to contempt orders occurring during the pendency of litigation, while the order here was post-decretal. The case they cite, *Sanders v. Monsanto Co.*, 574 F.2d 198, 199 (5th Cir.1978), states that a contempt motion is appealable if "not part and parcel of a continuing litigation…" because "no further district court action occurs." *Sanders* is inapposite. Factually, it was directed at a case of *denial* of a motion for contempt. Obviously if the court denies contempt following final judgment there will be no further proceed-

ings. Logically, an appeal should lie in such cases because "there is no other judgment from which an appeal will lie." *9 J. Moore & B. Ward, Moore's Federal Practice* ¶ 110.13[4] at 168 (2d ed. 1985).

■ In a case such as this, where the contempt motion is *granted,* the court will be (and here is) engaged in on-going intervention. The action complained of on appeal is subject to modification or repeal. The bar against interlocutory appeals of civil contempt citations facilitates compliance with court directives by allowing the trial judge to "place the keys of the prison cell in the contemnor's pocket." If we were to extend *Sanders,* and hold that any post-decretal contempt citation was immediately appealable, the effect would be to tie the hands of the district court, diminish compliance with its orders, and augment our own workload. Thus, the general rule is that "a contempt order entered in a postjudgment proceeding that does not terminate that proceeding is ... non-appealable." J. Moore, *supra,* at ¶ 110.14[1] at 198. There must be *both* a finding of contempt and a *noncontingent* order of sanction. *Shuffler v. Heritage Bank,* 720 F.2d 1141, 1145 (9th Cir.1983). Only at that point may the contemnor have his appeal.

■ Second, appellants point to the fact that there is an exception to the general rule that makes appealable contempt orders against non-parties. *Sanders,* 574 F.2d at 199; *J. Moore, supra,* at ¶ 110.14[1] at 198. This is their best argument, but it does not carry the day. While Alan's and Simmons were not parties to the original consent decree entered in January, the trial court found in its order of November 13 that they were the successor and *alter ego,* respectively, of Ryan's. Thus, while they were not named defendants in the consent

decree, their interests were in fact represented and their obligations determined as a matter of law. They were there but merely hidden behind the corporate veil which the trial court pierced in the November 13 order.

■ Third, they argue that even if the November 13 order is not a contempt sanction subject to interlocutory appeal, this action may still be appealed under 28 U.S.C.A. § 1292 (a)(1), which section permits appeals from interlocutory orders that modify an injunction. An appeal will lie under Section 1292 (a)(1) only if a subsequent order alters the legal relationship between the various parties. *Motorola, Inc. v. Computer Displays International,* 739 F.2d 1149, 1155 (7th Cir.1984). This Section is construed narrowly. *Carson v. American Brands, Inc.,* 450 U.S. 79, 84, 101 S.Ct. 993, 996, 67 L.Ed.2d 59 (1981).

■ Appellants argue that the original injunction issued as part of the consent decree imposed obligations to contribute to the pension fund only on Ryan's. The November 13 order added two new obligors and accelerated the amount due by requiring posting of the bond. This argument fails for two reasons. First, there was no modification as to the party obligors because the trial court's finding that Alan's is the successor and Simmons the *alter ego* of Ryan's means that they were, in effect, before the court for the original decree.

Second, the original decree set forth the total dollar amount owing and set up an installment payment plan. But the decree also specifically provided that the amount due would be accelerated upon default. R 1–6–6 to –7. The fact that the court was forced to do this following the November 22 hearing works no modification but rather is consistent with the original injunction.[1] The November 25 order "does not

---

**1.** While, as we noted *supra,* the November 13 order was not final because there remained several court imposed obligations on each party to be performed by November 22, it does not follow that the trial court modified the original injunction in its later order. We must be careful to distinguish between the proper concern of

Section 1292(a)(1)—changes in existing legal obligations imposed by means of injunctions—and the contingencies extant at the November 8 hearing. The latter were merely matters left open with directives to supply information or to comply in certain ways with the legal obligations imposed by the original decree and not

change the parties' original relationship, but merely restates that relationship in new terms." *Motorola*, 739 F.2d at 1155.

For the reasons foregoing, we hold that the order of the district court entered on November 13 was not final and appealable. It follows that we have no jurisdiction to entertain the appeal in No. 85–7743. It is dismissed.[2]

### B. *The Consent Decree and Rule 65:*

Appellants attack the trial court's judgment entering the consent decree on the grounds that it violates Fed.R.Civ.P. 65 (d), which rule provides that an order granting an injunction must "set forth the reasons for its issuance; shall be specific in terms; [and] shall describe in reasonable detail, *and not by reference to the complaint or other document,* the act or acts sought to be restrained ...." (Emphasis supplied.)

Appellants' complaint is that the decree and order below enjoined appellants, *inter alia*, to "otherwise comply with the reporting provisions of the Collective Bargaining Agreement attached to the Verified Complaint herein ...." Further, the court ordered appellants to "be obligated and bound to abide by the terms and conditions of the Judgment Note attached hereto ... and expressly incorporated by reference herein and made a part hereof." In so doing, appellants claim, the court violated the Rule's prohibition against incorporation by reference.

While the grant or denial of an injunction is generally entrusted to the discretion of the trial court, at issue here is whether that court properly applied the legal requirements of Rule 65. Accordingly, this matter is subject to plenary review. *Cathbake*, 700 F.2d at 656.

Appellants are entitled to no relief here for two reasons. First, while the preference is to enforce the requirements of Rule 65(d) "scrupulously," 7 *J. Moore, Moore's Federal Practice* ¶ 65.11 at 65–101 (2d ed 1985), failure to abide by the precise terms of the Rule does not compel finding the judgment below void. *Lawrence v. St. Louis-San Francisco R. Co.*, 274 U.S. 588, 591–92, 47 S.Ct. 720, 722, 71 L.Ed. 1219 (1927). Depending on the materiality of the departure from the Rule we may vacate or reverse the judgment, *J. Moore, supra*, at 65–102, or strike the offending clause from the decree. *Hartford-Empire Co. v. United States*, 323 U.S. 386, 410, 65 S.Ct. 373, 385, 89 L.Ed. 322 (1945). A court may also disregard the defect if it is clear from the totality of the language in the various documents that the contemnors understood their obligations under the injunction. *United States v. Goehring*, 742 F.2d 1323, 1324 (11th Cir.1984) (*per curiam*) (Rule 65(d) not specifically invoked, but contempt order upheld that incorporated earlier order because later order "contains sufficient findings of fact and conclusions of law for this court to perform its proper function and for the appellant to clearly understand the basis for the contempt order."); *Seagram-Distillers Corp. v. New Cut Rate Liquors, Inc.*, 221 F.2d 815, 821 (7th Cir.) (Rule 65(d)), *cert. denied*, 350 U.S. 828, 76 S.Ct. 59, 100 L.Ed. 740 (1955); *Ross-Whitney Corp. v. Smith Kline & French Laboratories*, 207 F.2d 190, 198 (9th Cir.1953) (Rule 65(d)).

The appropriate inquiry is into the degree of specificity of the language of the decree in order to determine that appellate review is possible and that the contemnors knew their obligations. *Schmidt v. Lessard*, 414 U.S. 473, 476–77, 94 S.Ct. 713, 715–16, 38 L.Ed.2d 661 (1974) (*per cu-*

---

subsequently modified. It was the *method of implementing* the legal obligations that changed, not the underlying obligations themselves.

**2.** Of course, this does not prevent us from considering the merits of these same issues in a properly constituted appeal. As both parties agreed at oral argument, all of the substantive issues contested in No. 85–7743 were restated in

No. 85–7751. Further, the trial court's judgment of November 25 incorporated by reference all of the factual and legal conclusions reached in the November 13 order. Thus, we must still resolve all of the issues presented in both appeals. Accordingly, the substantive effect of dismissing No. 85–7743 is nil.

*riam* ). The Supreme Court in *International Longshoremen's Assoc., Local 1291 v. Philadelphia Marine Trade Assoc.*, 389 U.S. 64, 88 S.Ct. 201, 19 L.Ed.2d 236 (1967), considered the specificity and incorporation by reference provisions of Rule 65(d). Contrary to appellant's suggestion, the Court did not announce a *per se* requirement of dismissal where a trial court fails to adhere strictly to the provisions of the Rule. As the Court in *Longshoremen's* noted, it was not dealing "with a violation of a court order by one who fully understands its meaning but chooses to ignore its mandate[, but rather with] a decree that can only be described as unintelligible." 389 U.S. at 76, 88 S.Ct. at 208. The Court's concern was with notice, with ensuring that the trial court's decree not furnish a basis for contempt unless it constituted "an operative command capable of 'enforcement.' " *Id.* at 74, 88 S.Ct. at 206; *accord, Schmidt*, 414 U.S. at 476, 94 S.Ct. at 715. In this case there is no question but that the decree was intelligible and capable of enforcement. Nor is there any question as to whether the appellants understood their obligations, for they complied with the decree for almost three months.

Appellants place great stock in *United States Steel Corp. v. United Mine Workers*, 519 F.2d 1236 (5th Cir.1975), *cert. denied*, 428 U.S. 910, 96 S.Ct. 3221, 49 L.Ed.2d 1217 (1976). The Court there, relying on *Longshoremen's*, held that an order that incorporated into its provisions contract language from a collective bargaining agreement was a violation of Rule 65(d) because the ambiguity of the contract's language did not give adequate notice. *Id.* at 1246–47. But this case simply will not bear the weight that appellants seek to place upon it. The crucial contractual provision there was the arbitration clause, which the Court characterized as "extraordinarily broad." *Id.* at 1247. Upon the facts of that case, and the tethering of the opinion to *Longshoremen's*, there can be no doubt that the former Fifth Circuit was not adopting a *per se* rule. Rather it made an individualized determination based on the factual posture of that case.

Second, as appellees point out, at no time before the trial court did appellants ever complain about the adequacy of the consent decree which they themselves helped to craft. They made no attempt to request more specific language; they chose not to exercise their right to the usual remedy for inadequacies of this sort: a motion for clarification or modification of the consent decree. *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192, 69 S.Ct. 497, 500, 93 L.Ed. 599 (1949); *Newman v. State of Alabama*, 683 F.2d 1312, 1318 & n. 15 (11th Cir.1982), *cert. denied*, 460 U.S. 1083, 103 S.Ct. 1773, 76 L.Ed.2d 346 (1983). At this point any possible objection they might have to the decree is stale. *Seagram-Distillers Corp. v. New Cut Rate Liquors, Inc.*, 221 F.2d at 821.

As Professor Moore has explained, "There is compliance with the Rule when the injunction states reasons for its issuance, clearly identifies the persons to whom it applies, and defines the acts enjoined." *J. Moore, supra*, at ¶ 65.11 at 65.106. On these facts, and after reading the decree and its attachments, it is clear that all three requirements were met, regardless of the technical language of Rule 65(d). There can be no question but that the appellants were fully aware of their obligations. The best evidence is the fact that they complied with the requirements of the consent decree, in whole or in part, for three months. There is no error.

### C.  *Money Judgments and Remedies:*

The issue here is really the correctness of the original issuance of the consent decree and the subsequent availability of measures including incarceration to enforce it. Proper resolution of these questions requires that we be both careful and precise in our review of what took place below over the course of three hearings that culminated in the issuance of four separate court orders or judgments.

1) First, appellants attack the trial court's entry of the November 25 judgment on the grounds that it effected enforce-

ment of a money judgment against nonparties to the agreement by means of a contempt sanction. They argue that the appropriate means to enforce a money judgment is via a writ of execution. This is a challenge to a conclusion of law subject to plenary review. *Cathbake*, 700 F.2d at 656.

■ It is beyond question that a court may use the remedy of a citation of contempt to enforce an earlier judgment entered pursuant to a consent decree. *Newman v. State of Alabama*, 683 F.2d at 1318; *United States v. City of Jackson*, 519 F.2d 1147, 1152 n. 9 (5th Cir.1975). It is equally clear that when a party fails to satisfy a court-imposed money judgment the appropriate remedy is a writ of execution, not a finding of contempt. *Shuffler v. Heritage Bank*, 720 F.2d 1141, 1147–48 (9th Cir.1983); Fed.R.Civ.P. 69(a) ("Process to enforce a judgment for the payment of money shall be a writ of execution, unless the court directs otherwise."). The "otherwise" clause is read narrowly. 7 *J. Moore, Moore's Federal Practice* ¶ 69.02[2] at 69–10 to –10.1 (2d ed. 1985) ("[A] federal court should not ... enforce a money judgment by contempt or methods ther [sic] than a writ of execution, except in cases where established principles so warrant.").

The order entered in January pursuant to the consent decree is properly characterized as a money judgment. It makes extensive provision for the payment of money to appellees that the court found to be due and owing. The amount owed was not contingent, nor was the obligation to pay conditioned on whether appellants purged themselves of contempt. The only variable was whether it would be paid immediately

or in installments. The consent decree provided for both, depending upon the circumstances.

■ Appellees argue that the consent decree was not a money judgment because it "forestalled the entry of a final judgment of money subject to execution" which came with the November 25 order. This does not obtain. The decree entered in January made an award of money.[3] As appellees concede, a consent decree is a judgment. *United States v. Kellum*, 523 F.2d 1284, 1287 (5th Cir.1975). We see no principled distinction between that which appellees concede was a money judgment in *Shuffler* and that which they claim is something else here.[4] In both cases the trial courts accepted consent decrees that determined that the defendant owed the plaintiff a good bit of money and set up a procedure to pay that money over.

The mere fact that the trial court entered a money judgment in January is not dispositive of the appellants' allegation of error, however. Had the trial court actually entered a finding of contempt for the failure of the appellants to pay the approximately $725,000 there would have been reversible error, for the reason we just explained. But that is not what the trial court did. The November 13 order found the appellants in contempt, in part it appears, for failure to pay this money. But the trial court did not actually attempt to effect its finding or to coerce the appellants into abandoning their contumacious conduct. The court delayed any implementation or enforcement of its finding for two weeks so that the appellants could purge themselves of contempt. It appears that the court intended to enter a final finding of

---

3. Appellees later concede this, perhaps unintentionally. Brief at 32–33 ("At the hearing on November 8, the Court granted the Funds a sum certain based upon the undisputed amount for which Appellants were delinquent under the Consent Decree.")

4. Appellees point to *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 69 S.Ct. 497, 93 L.Ed. 599 (1949), which case held that a contempt sanction could be used to ensure compliance with an earlier judgment to pay wages in accordance

with federal labor law requirements of minimum wages and overtime pay. That case is distinguishable, however, and the distinction lies in the fact that in *McComb* the Court was vindicating the power of the trial court to order a business to comply with the terms of a statute. That order had the concomitant effect of requiring money to be paid in the future. In the instant case, at issue is money past due and owing which was awarded in one large amount —i.e., a money judgment that was retrospective.

contempt on November 25 if appellants had not demonstrated their good faith.

The court's order of November 25, however, abandoned the avenue of contempt down which it had started to move on November 13. Instead the court simply entered a final civil judgment determining the current obligations of the appellants to the appellees. That judgment, standing alone, finds that the appellants had not made a good faith effort to fulfill the obligations of the original consent decree and enters a final judgment ordering payment in full of the amount due under the January decree and that which had accrued in the meantime. In effect, then, the November 25 order modified and superseded the money judgment contained in the January consent decree.

We have not yet reached the point where the trial court is attempting to effect compliance with its November 25 order. If the appellants choose not to comply, then the trial court may respond as it sees fit, bearing in mind the legal principles we today articulate.

2) Simmons contests the trial court's entry of a second order on November 25 that he be incarcerated until he demonstrates good faith efforts to comply with the court's orders and decrees. In no event would the incarceration be for more than 21 days. Simmons also objects that the trial court ordered incarceration *sua sponte,* rather than upon the specific motion of the appellees, and therefore, he claims, transformed the contempt finding into a criminal penalty.

Because imposition of incarceration is a contempt sanction and effects denial of liberty without according the usual constitutional guarantees, it is a serious step generally resorted to only when other, less draconian methods to secure compliance have proved fruitless. Courts are careful to distinguish between civil and criminal contempt, usually ordering incarceration as a criminal penalty, so as to ensure that the full guarantee of due process is preserved. *See generally, In re Monroe,* 532 F.2d 424 (5th Cir.1976).

■■■■ Our sole inquiry into the legitimacy of incarceration for contempt, *per se,* is into the purpose of imprisonment. If the court's goal is to coerce, rather than to punish, then incarceration is viewed as civil even though imprisonment has concomitant punitive effects. *Shillitani v. United States,* 384 U.S. 364, 370, 86 S.Ct. 1531, 1535, 16 L.Ed.2d 622 (1966); *In re Dinnan,* 625 F.2d 1146, 1149 (5th Cir. Unit B 1980) (*per curiam* ). The distinction between coercion and punishment is one finely drawn. It is nonetheless distinct and dispositive. When an order of incarceration is conditioned upon a refusal to comply in good faith with a court order then the purpose is coercive. Such incarceration represents a legitimate use of the civil contempt power of the court because it has "the obvious purpose of compelling the witnesses to obey the orders [of the court]. When the petitioners carry 'the keys of their prison in their own pockets'; the action 'is essentially a civil remedy designed for the benefit of other parties and has quite properly been exercised for centuries to secure compliance with judicial decrees.'" *Shillitani,* 384 U.S. at 368, 86 S.Ct. at 1534 (quoting *In re Nevitt,* 117 F. 448, 461 (8th Cir.1902)); *Dinnan,* 625 F.2d at 1149. If a court instead seeks to punish, or to vindicate its own authority, then the contempt imposed is criminal and a plethora of procedural protections are invoked. *United States v. United Mine Workers of America,* 330 U.S. 258, 303–04, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947); *Dinnan,* 625 F.2d at 1149.

■■■■ The propriety of the trial court's order of incarceration in this case, however, is not immediately evident. If we properly interpret the trial court's order as premised on failure to make good faith efforts to comply with the appellants' obligation to demonstrate present inability to pay (as discussed at E. *infra* ), or to furnish the court with certain information, then the incarceration order was civil and was proper. The purpose of the order would be to goad Simmons into complying or showing an inability to comply with the

court's orders. To that effect the court noted that Simmons was to be held for 21 days, but that he could "be released from custody at such shorter period of time as he demonstrates to the Court his willingness to make a good faith effort to comply with the prior orders of [the] Court." Order of November 22, R1–35–2. In that case, the sanction was clearly coercive and conditioned on continued contumacious conduct—a classic exercise of the civil contempt power. The fact that the appellees did not specifically request incarceration[5] is immaterial, for they made a general request for whatever remedy the court deemed appropriate.[6]

■ On the other hand, if the trial court was in any way attempting to secure payment of the money found to be owing under either the consent decree or the November 13 contempt finding, then the November 25 order of incarceration was improperly entered because, as we explained *supra*, a money judgment is not properly enforced except by a writ of execution. If that were the case, then this procedural defect would have infected and impugned the legitimacy of the incarceration order *in toto*, even though incarceration could properly have been ordered for a more limited purpose. Accordingly, we must remand the case on this narrow question so that the trial court may clarify the precise purpose of its incarceration order of November 25. If its purpose was to coerce good faith efforts to comply, or to coerce a showing of inability to comply, then the order was proper. If the purpose was to coerce the appellants into satisfying the money judgment, then it was improper.

D. *Successor and* Alter Ego:

The next question is whether, by whichever means, the obligation imposed may be enforced against Simmons and Alan's. The determination that one may be held liable as *alter ego* or successor to another is a factual determination that is reversible only for clear error. Fed.R.Civ.P. 52(a). "This deferential standard of review imposes an especially heavy burden on the appellant in a case such as this, in which the evidence was largely testimonial, and the district court had the advantage of observing the witnesses and evaluating their credibility first-hand." *Lincoln v. Board of Regents*, 697 F.2d 928, 939 (11th Cir.), *cert. denied*, 464 U.S. 826, 104 S.Ct. 97, 78 L.Ed.2d 102 (1983).

The Supreme Court in *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 65 S.Ct. 478, 89 L.Ed. 661 (1945), found that those denominated "successors and assigns" could be held liable for damages flowing from failure to abide by an injunction. "Successors and assigns may ... be instrumentalities through which defendant seeks to evade an order or may come within the description of persons in active concert or participation with them in the violation of an injunction. If they are, by that fact they are brought within [the] scope of contempt proceedings by the rules of civil procedure [Rule 65(d)]." *Id.* at 14, 65 S.Ct. at 481. Likewise, the Court has held that injunctions to prevent violations of the Fair Labor Standards Act, 29 U.S.C.A. § 201 *et seq.* (1985), may be enforced by contempt proceedings "against the corporation, its agents and officers and those individuals associated with it in the conduct of its business, [and]

---

5. The record reveals in relevant part:
   THE COURT: "What can this Court do to coerce compliance ..."

   \*   \*   \*   \*   \*   \*

   MR. STROPP: "... Your Honor, we are interested in simply getting paid in accordance with the Court's consent decree and order. We do not believe that Mr. Simmons has established his inability defense. Any additional measures we would leave within the Court's discretion to coerce compliance."
   R3–83—84.

6. Appellants' citation to *First Maryland Leasecorp. v. M/V Golden Egret*, 764 F.2d 749 (11th Cir.1985), is inapposite. We there held that it was error for the trial court to impose a contempt fine *sua sponte*, but in that case neither party had moved for contempt, there was neither notice nor a hearing, and the court had received no evidence of any sort on damages. In the instant case the sanction was imposed upon motion and hearing with ample opportunity to contest the issues.

it may also, in appropriate circumstances, be enforced against those to whom the business may have been transferred, whether as a means of evading the judgment or for other reasons." *Walling v. Reuter Co.*, 321 U.S. 671, 674, 64 S.Ct. 826, 828, 88 L.Ed. 1001 (1944).

On the other hand, in *North Pacific Steamship Co. v. Pyramid Bulkcarriers, Inc.*, 515 F.2d 426 (5th Cir.1975) (*per curiam*), the Court would not pierce the corporate veil to bring in the "phantom" parties in an admiralty action on a motion for an order to show cause. The Court was not so much hostile to the idea, however, as perplexed. "[W]e find no decision, rule, or statute which would authorize a plaintiff to shift the burden of proof to third parties not even named in the original suit." *Id.* at 427. The panel went on to state that it was not foreclosing the use of the *alter ego* doctrine or the piercing of a judgment debtor's corporate veil "[u]nder proper circumstances and procedures." *Id.*

The *North Pacific* case is distinguishable on the purely factual grounds that it involved an admiralty, as opposed to a labor case. But more importantly, because *North Pacific Steamship* does not squarely control, and because liability here flows from ERISA, we find it appropriate to follow the Supreme Court's holdings, in cases arising under analogous labor law statutes, that have permitted imposing liability for contempt on a successor or *alter ego*.[7]

■ Accordingly, we affirm the district court's determination that Simmons and Alan's are liable to the Trustees for the unpaid pension funds. The factual support for the trial court's finding, in both respects, is overwhelming. Simmons directed and controlled the finances of both companies, as well as numerous others, and ran the whole lot out of one office. The decision not to pay the obligation under the consent decree was his. During the period when Ryan's was in default of its obligations under the consent decree, Simmons authorized over $60,000 in payments to himself and to other of his wholly owned concerns. Ryan's sales to Alan's were at prices significantly under market value and Ryan's accepted payment in the form of a $1.5 million interest-free note from Alan's to be paid in seven years. Upon the totality of the circumstances, it was not clearly erroneous to conclude that there was skimming and funneling of money from the one to the other. Further, there was significant intermingling of funds beginning in March, as well as overlap of administrative personnel. Ultimately Alan's took over the mining operations of Ryan's and issued paychecks to Ryan's employees from Alan's accounts. Upon all of this evidence we cannot properly say that the trial court's findings were clearly in error.

### E. *Present Ability to Pay:*

■ Appellants challenge the trial court's finding that they collectively had the present ability to satisfy the burden of the consent decree. This is a prerequisite to a finding of contempt and the entry of sanctions for noncompliance; it is improper to impose contempt sanctions of any sort if the alleged contemnor is not able to satisfy the court's directives. *United States v. Rylander*, 460 U.S. 752, 757, 103 S.Ct. 1548, 1552, 75 L.Ed.2d 521 (1983). The trial court's finding of present ability to pay is a factual determination entrusted to the sound discretion of the court and subject to the clearly erroneous rule. *United States v. Hayes*, 722 F.2d 723, 725 (11th Cir.1984) (*per curiam*); *cf., Matter of Newton*, 718 F.2d 1015, 1022 (11th Cir. 1983), *cert. denied sub nom. Trio Manufacturing Co. v. United States*, 466 U.S. 904, 104 S.Ct. 1678, 80 L.Ed.2d 153 (1984).

---

**7.** Despite protestations by successor corporations, *Computer Sciences Corp. v. NLRB*, 677 F.2d 804, 806 (11th Cir.1982), and by corporate officers, *Donovan v. Grim Hotel Co.*, 747 F.2d 966, 973 (5th Cir.1984), *cert. denied*, — U.S. —, 105 S.Ct. 2654, 86 L.Ed.2d 272 (1985), that it is a denial of due process to impose contempt sanctions in the same proceeding in which that corporation or officer is first determined to be a successor or *alter ego* and hence bound by the court's prior judgment, a contempt action may go forward if "the dispute over successorship liability is but a sham." 677 F.2d at 806. That is the case here.

■ The party seeking the contempt citation retains the ultimate burden of proof, but once he makes out a *prima facie* case, the burden of production shifts to the alleged contemnor, who must then come forward with evidence to show a present inability to comply that goes "beyond a mere assertion of inability and satisf[ies] his burden of production on the point by introducing evidence in support of his claim." *Hayes*, 722 F.2d at 725.

This burden is satisfied by making "in good faith all reasonable efforts to comply." *United States v. Rizzo*, 539 F.2d 458, 465 (5th Cir.1976). We construe this requirement strictly. "Even if the efforts he did make were 'substantial,' 'diligent' or 'in good faith,' ... the fact that he did not make 'all reasonable efforts' establishes that [respondent] did not sufficiently rebut the ... prima facie showing of contempt. The ... use of a 'some effort' standard for measuring the strength of [the] defense [would be] an abuse of discretion." *Hayes*, 722 F.2d at 725 (citation omitted); *Hodgson v. Hotard*, 436 F.2d 1110, 1115 (5th Cir. 1971).

■ Under this high standard, the trial court was not in error. There is ample evidence to support the trial court's determination that the Trustees made a prima facie showing of noncompliance. Nor was there error in the district court's determination that appellants failed to meet their burden of production. The financial records they submitted were seriously inadequate. The income statements were unverified and based on the representations of Simmons, rather than on independent audits. Asset valuations were found to be significantly understated. Financial records were generally incomplete and did not include current statements or tax returns. It may be that Simmons and Alan's in fact lack the present ability to pay the obligation of Ryan's. But their failure to make all reasonable efforts to demonstrate that fact for the court means they were properly held in contempt.

## III.

The appeal from the November 13 order, No. 85–7743, was improperly brought. It is neither a final order of the trial court nor an order that will support an interlocutory appeal. Accordingly, it is DISMISSED.

As to the contention that the injunction issued was not in precise compliance with Rule 65, there is no reversible error because there was no prejudice and because appellants failed to object to the defect. Appellants knew of their obligations under the injunction and performed consistent with those obligations, at least in part, for three months. The November 25 entry of a civil money judgment was proper. The determination that Simmons is the *alter ego* and that Alan's is the successor to Ryan's was likewise properly made. Because appellants failed to meet their burden of persuasion on the question of present ability to pay, there is no reversible error. Thus, upon all of these questions, presented in the appeal of No. 85–7751, the judgment of the trial court is AFFIRMED. We must remand, however, the November 25 order of incarceration in order that the trial court may clarify its purpose in entering that order. If it sought to penalize lack of good faith compliance with its earlier orders then incarceration was proper; if the court sought, in whole or in part, to enforce a money judgment, then that order was improper. Accordingly, that portion of the trial court's order directing the incarceration of Simmons is VACATED and REMANDED for clarification or modification by the trial court in light of this opinion.