**ROYAL CUP, INC., an Alabama Corporation, Plaintiff–Appellant, Cross–Appellee,**

**William E. Smith, Jr., Plaintiff–Counterclaim Defendant,**

v.

**JENKINS COFFEE SERVICE, INC., a Tennessee corporation, and Guy R. Jenkins, a Tennessee resident, Defendants–Counterclaim Plaintiffs–Appellees, Cross–Appellants.**

No. 88–7487.

United States Court of Appeals, Eleventh Circuit.

April 25, 1990.

James L. Priester, and Daniel H. Mark-stein, III, Maynard, Cooper, Frierson & Gale, P.C., Birmingham, Ala., for plaintiff-appellant, cross-appellee.

Bert P. Taylor, Smith & Taylor, Birmingham, Ala., for defendants-counterclaim plaintiffs-appellees, cross appellants.

Before TJOFLAT, Chief Judge, CLARK, Circuit Judge, and SMITH *, Senior Circuit Judge.

* Honorable Edward S. Smith, Senior U.S. Circuit Judge for the Federal Circuit, sitting by designa-tion.

TJOFLAT, Chief Judge:

This contract dispute arises from the sale of a portion of a coffee service business.[1] Both the buyer, Royal Cup, Inc. (Royal Cup),[2] and the seller, Jenkins Coffee Service, Inc. (JCS),[3] appeal from the judgment of the district court awarding (1) $4,400.00 to JCS, representing the unpaid balance of the purchase price less contractually authorized deductions; and (2) $33,000.00 in attorneys' fees to Royal Cup. We affirm the $4,400.00 award to JCS and reverse the award of attorneys' fees.

## I.

### A.

Royal Cup and JCS operate coffee service businesses in several southeastern states. In the fall of 1986, Royal Cup became interested in purchasing two JCS routes in the Mobile, Alabama and Pensacola, Florida areas. Several months of negotiation followed, during the course of which JCS, in response to Royal Cup's questioning, told Royal Cup that it had 310 active accounts as of December 31, 1986. The parties eventually reached an agreement, and, on or about April 21, 1987, executed an "Agreement to Purchase and Sell" (the contract), drafted by Royal Cup.

Under the contract, Royal Cup was to pay JCS a total purchase price of $297,251.00. Value was apportioned as follows:

| | |
|---|---|
| Brewing Equipment: | $172,250.00 |
| Identifying Marks and Customers List: | 1.00 |
| Covenant not to Compete: | 125,000.00 |
| Total: | $297,251.00 |

The contract did not ascribe a separate dollar value to JCS' customers, either individually or in the aggregate, but the recited consideration of $1.00 for identifying marks and customers list was to cover customer route cards (account histories) and "all good will inherent in the same." The purchase price was to be paid in the following steps:

(1) $50,000.00 already delivered as a down payment;

(2) $146,251.00 upon closing;

(3) $101,000.00 on July 24, 1987, twelve weeks after the May 1, 1987 closing.

JCS was to transfer assets including all (but not less than 370) units of used coffee brewing equipment, all salable merchandise inventory on hand,[4] a current customer list plus all customer route cards, and the right to use JCS' name and identifying symbols for a six-month period after closing. JCS also agreed not to compete with Royal Cup in the territories for a period of five years.

In addition to the above terms, the contract provided that the purchase price would be reduced upon the occurrence of certain events. Under the heading of "Warranties and Representations of Seller," the contract recited that JCS had 310 active accounts as of December 31, 1986 and provided that, for each such account that did not remain an active account for Royal Cup, the balance of the purchase price due twelve weeks after closing, i.e., $101,000.00, would be reduced by $500.00. During an eight-week, post-closing "validation" period, Royal Cup would examine JCS customer lists and route cards, work the territory, and ascertain how many JCS customers qualified as active accounts; the contract specified the criteria on the basis of which an account would qualify as active. In another price-reduction provision, the contract stated that, if JCS delivered fewer than 370 units of coffee brewing equipment, the purchase price would be lowered by $150.00 for each missing unit.

1. We entertain this matter under our diversity jurisdiction. *See* 28 U.S.C. § 1332 (1982). The contract provided that Alabama law would govern, and there has been no cause to question that provision.

2. William E. Smith, the president of Royal Cup, Inc., was joined as a party along with Royal Cup, Inc. Unless we specify otherwise, we include both Mr. Smith and the corporation in any reference to "Royal Cup."

3. Unless we specify otherwise, when we refer to "JCS," we include both Jenkins Coffee Service, Inc. and Guy R. Jenkins, president and majority shareholder of the corporation, who is also a party in this action.

4. Royal Cup would pay a separate price for the merchandise inventory, calculated as of the date of closing. That transaction is not in dispute.

Unlike the customer-account provision, the adjustment for missing units of brewing equipment was not expressly tied to the post-closing payment.

Also relevant to the current dispute is a contract provision that, in any suit to compel compliance with the terms of the contract or to obtain damages for breach, the prevailing party would be entitled to reimbursement for reasonable attorneys' fees and reasonable expenses of litigation.

On July 24, 1987, the day fixed for payment of the remaining purchase price, i.e., $101,000.00 minus reductions for any accounts that did not qualify as active, Royal Cup filed suit in United States District Court for the Northern District of Alabama, alleging breach of contract and fraud. In its breach of contract claim, Royal Cup alleged that JCS did not have 310 "active customers" on December 31, 1986, and that JCS had "fail[ed] to deliver its assets based upon the performance criteria expressly incorporated in the Purchase Agreement." Royal Cup sought $25,000.00 in compensatory damages for the alleged breach. The fraud claim was based on essentially the same factual allegations as the contract claim and on additional allegations that JCS had engaged in sales and accounting practices designed to inflate its assets and sales volume and that JCS had intentionally or recklessly misrepresented these to Royal Cup. On the fraud claim, Royal Cup sought $25,000.00 in compensatory damages and $250,000.00 in punitive damages. In connection with both claims, Royal Cup sought attorneys' fees pursuant to the contract.

JCS counterclaimed, also alleging breach of contract and fraud. JCS based its contract claim on Royal Cup's alleged "fail[ure] to pay the balance of $100,000.00 [sic] owing to defendants under the agreement." In addition, JCS claimed that Royal Cup had breached the contract by failing to use its best efforts, as promised, to maintain former JCS customers as active Royal Cup accounts. JCS alleged in its fraud claim that Royal Cup, at the time of promising to use best efforts, had no intention of keeping that promise. JCS also sought attorneys' fees under the contract.

The case went to trial before a jury. Royal Cup advanced the theory that it had substantially overvalued the JCS routes based on JCS' warranty of 310 active accounts whereas the routes actually contained many fewer accounts. Royal Cup's president testified that he would not have paid the "roughly $300,000.00" price for fewer than 310 accounts and hypothesized that his valuation of a business with "225 accounts" would have been "somewhere on the order of $165,000.00, $175,000.00." He explained that customer loyalty is a large factor in the coffee service business and that the $500.00 price-reduction provision for each non-validating account was intended as protection against the "slippage" that inevitably occurs when such a business changes hands. Mr. Troy Haas, the Royal Cup executive in charge of implementing the acquisition, testified that only 130 of the expected 310 accounts "validated" (i.e., qualified as active) and that Royal Cup was therefore seeking a $90,000.00 price reduction (180 × $500.00) under the contract. In addition, he stated that Royal Cup sought a second price adjustment of $6,150.00 because only 329 of the expected 370 pieces of brewing equipment were delivered. Both parties introduced numerous exhibits relating in general to their sales and accounting practices and in particular to the number of JCS accounts and brewers.

In closing argument, counsel for JCS invoked the contract's price-reduction provision; he requested the jury to determine the number of legitimate "chargebacks" and to reduce the $101,000.00 final payment accordingly. Counsel for Royal Cup requested damages totaling "$117,650.00" [sic], calculated as follows:

| | |
|---|---|
| Overvaluation of JCS' business (Contract price: $297,000.00 Less true value: $175,000.00): | $ 122,000.00 |
| Set-off for nonvalidating accounts: | 90,000.00 |
| Set-off for undelivered brewers: | + 6,150.00 |
| Subtotal: | $ 218,150.00 |

Amount still owed to JCS under
the contract: — 101,000.00

Total: $117,150.00 [5]

Royal Cup also requested attorneys' fees in the amount of $38,669.00.

The court instructed the jury on both the fraud and contract claims.[6] Then, pursuant to Fed.R.Civ.P. 49(a), the court directed the jury to return its decision on a special verdict form containing a number of interrogatories. Responding to the interrogatories on the fraud claims, the jury found that neither party was entitled to recover for fraud. The interrogatories and jury answers dealing with the breach of contract claim were as follows:

1. Did you find from a preponderance of the evidence that [JCS] breached the Agreement to Purchase and Sell dated May 1, 1987?

   YES _X_
   NO _____

2. If your answer to 1 is "yes,"
   (a) what amount of compensatory damages, if any, did you find from a preponderance of the evidence that Royal Cup, Inc. is entitled to recover for the breach of contract?

   $96,600.00

   (b) what amount, if any, is Royal Cup, Inc. entitled to recover as its reasonable attorneys' fees?

   $33,000.00
   ....

5. Did you find from a preponderance of the evidence that [Royal Cup] breached the Agreement to Purchase and Sell dated May 1, 1987?

   YES _____
   NO _X_
   ....

13. If you include an amount of damages in No. 2(a), itemize how you arrived at said amount.

   $90,000—for accounts not validated
   $6,600—for unaccounted Brewers
   ....

   TOTAL $96,600.00

5. Royal Cup's request for $117,650.00 rather than for $117,150.00 was apparently due to a simple error of arithmetic.

6. Neither party objected to the manner in which the district court submitted the breach of con-

The jury's answers appeared inconsistent: although the jury found that JCS "breached" the contract, it calculated its award of "damages" to Royal Cup according to the specific contractual provisions for purchase-price reductions. Neither party, however, requested that the special interrogatories be returned to the jury for clarification.

Before the district court entered judgment, it addressed the apparent inconsistency in a memorandum opinion. The court pointed out that the jury expressly based its $96,600.00 award to Royal Cup on a shortfall in the number of JCS customer accounts and brewing equipment promised in the contract. The court also noted that the amounts awarded were directly traceable to evidence regarding the number of nonvalidated accounts and missing equipment. Therefore, despite the jury's answers that JCS had breached the contract and Royal Cup had not, the court held that JCS was still entitled to $4,400 *under the contract* as the balance of the unpaid purchase price less adjustments (i.e., $101,000.00 — $96,600.00). The court then deducted $4,400.00 from the $33,000.00 awarded by the jury to Royal Cup as attorneys' fees and awarded final judgment for Royal Cup in the amount of $28,600.00.

JCS moved the court to alter or amend the judgment, or in the alternative for judgment notwithstanding the verdict, solely on the issue of attorneys' fees.[7] It argued that, according to the judgment, Royal Cup was not a "prevailing party" and was therefore not entitled to attorneys' fees under the contract. The court denied the motion, concluding that the contract was ambiguous with respect to the circumstances under which attorneys' fees were recoverable and that JCS had waived a special verdict or finding on the matter.

Royal Cup then filed a notice of appeal, and JCS cross-appealed.

tract claims to the jury, nor has either party asserted on appeal that the district court erred in this respect.

7. Neither party moved for a new trial.

## B.

Royal Cup argues on appeal that the verdict was not inconsistent but was only rendered so by the district court's interpretation. Royal Cup claims that the court rejected an interpretation that would harmonize the jury's answers and that, to rationalize its own interpretation, the court was required to change two of the jury's answers. Royal Cup points to the jury's answers to the breach-of-contract interrogatories (Nos. 2 and 5: that JCS breached the contract and that Royal Cup did not), and asserts that the court's judgment awarding JCS recovery of the purchase price under the contract depends upon exactly the opposite findings (i.e., that Royal Cup breached the contract and that JCS did not). The court's judgment therefore, according to Royal Cup, denies Royal Cup's seventh amendment right to a jury determination of those factual issues. Contending that "[a] court may not ... reject a potentially consistent interpretation in favor of 'one possible view of the case which will make the jury's finding inconsistent,'" Royal Cup proposes its own "potentially consistent" interpretation. According to Royal Cup, the jury could have found that the $101,000.00 owed to JCS under the contract was "netted out" by Royal Cup's overvaluation of JCS' business as warranted (i.e., with 310 active accounts) compared to its value as actually delivered (i.e., with substantially fewer accounts). In other words, JCS' representation that it had 310 active accounts caused Royal Cup to overvalue the business by $101,000.00, which *coincidentally* was the amount of the purchase price scheduled to be paid twelve weeks after closing. The jury could also have found that JCS *owed* Royal Cup an *additional* $96,600.00 in compensatory damages for missing accounts and equipment (plus the $33,000.00 in attorneys' fees). Thus, according to Royal Cup, its damages resulting from the overvaluation and its damages resulting from nonvalidated accounts were completely unrelated. In sum, this court is asked to reinstate the "verdict in favor of Royal Cup in the amount of $129,600.00 [$96,600.00 + $33,000.00]."

JCS responds that, if the jury intended to "net out" the $101,000.00 as compensatory damages for Royal Cup's overvaluation of the business, over and above the $96,600.00 assessed against JCS for the shortfall in customers and equipment, such an award would be unsupported by the evidence. Like the court below, JCS views the jury award of $96,600.00 to Royal Cup not as damages for breach of contract but as adjustments to the purchase price made pursuant to contractual provisions.

In its cross-appeal, JCS asserts that, according to the district court's judgment awarding the $4,400.00 balance of the purchase price to JCS, Royal Cup is not a prevailing party and hence is not entitled to attorneys' fees under the contract. JCS argues that although it waived its own recovery of attorneys' fees, it did not waive the contractual provision that limits recovery of attorneys' fees to the prevailing party. Therefore, JCS requests this court to enter judgment in its favor for $4,400.00 plus costs.

## II.

■ Royal Cup relies on the well-established principle that a court must attempt to reconcile a jury's apparently inconsistent answers to special interrogatories. *See Gallick v. Baltimore & O.R.R.*, 372 U.S. 108, 119, 83 S.Ct. 659, 666, 9 L.Ed.2d 618 (1963); *Griffin v. Matherne*, 471 F.2d 911, 915 (5th Cir.1973).[8] The test for resolving apparent inconsistencies "is whether the answers may fairly be said to represent a logical and probable decision on the relevant issues as submitted." *Griffin*, 471 F.2d at 915. Our role as an appellate court is to review the record fully in order to ascertain whether the district court's reconciliation of the apparently inconsistent verdict represents a fair and reasonable reading of the case. *See Toner v. Lederle*

---

**8.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

*Labs.,* 828 F.2d 510, 513 (9th Cir.1987), *cert. denied,* 485 U.S. 942, 108 S.Ct. 1122, 99 L.Ed.2d 282 (1988); *Burger King Corp. v. Mason,* 710 F.2d 1480, 1488–89 (11th Cir. 1983), *cert. denied,* 465 U.S. 1102, 104 S.Ct. 1599, 80 L.Ed.2d 130 (1984). To determine whether the answers in the case before us represent a logical and probable decision on the relevant issues and whether the district court's interpretation of those answers was fair and reasonable, we first analyze the transaction that gave rise to this litigation. We then examine the jury's answers and the district court's reconciliation of those answers.

### A.

Although the contract is not a model of clarity, at base it represents a common business deal covering a common business situation: Seller represents to Buyer a certain number (or value) of assets; Buyer doubts the accuracy of the representation or the ability of Seller to deliver; so the parties include in the sales contract a provision for adjusting the sales price according to the number (or value) of assets actually delivered and a mechanism for determining that final number (or value). This model remains the same in essence whether it is expressed in terms of:

(A) Buyer's promise to pay a bottom-line sum for specified assets plus a further amount for each additional asset delivered, or

(B) Seller's promise to accept a reduced purchase price if fewer than a recited number of assets are delivered.

In the latter situation, Seller "promises" in the contract that he has and will deliver X assets in consideration for Y dollars but effectively qualifies the promise with a "but if I don't" provision, and consideration from Buyer is adjusted accordingly. While Seller may not deliver to the full extent of the "promise" and may thus be said in lay terms to have "broken" the promise, he cannot be said to have *breached the contract,* because the contract itself covers the contingency of less-than-complete delivery. Nor can the broken promise be said to have damaged Buyer, since Buyer pays only the reduced price calculated according to the contract; "compensation" to Buyer, for receiving less than the recited quantity, has already been factored into the deal in the form of that price reduction.

In the case before us, the contract stated a total price and provided for a deduction of $500.00, to be taken from the final post-closing payment of $101,000.00, for every account less than 310 that did not validate. In other words, Royal Cup had severe doubts about JCS' representation that it had 310 active accounts and protected itself contractually against a shortfall of approximately *two-thirds* in the number of accounts: [9] if 202 ($101,000.00 divided by $500.00) or more accounts did not validate, Royal Cup would owe JCS no additional money. Although the contract covered this contingency by stating a purchase price of $297,251.00 less deductions potentially totaling $101,000.00, the provision meant, in effect, that Royal Cup was willing to pay *a minimum price of $196,251.00* for the two routes even if only roughly one-third (108) or fewer of the accounts validated.[10] It

**9.** Royal Cup argues that the price-adjustment provision was inserted to cover "normal slippage" in the number of accounts that actually ended up as Royal Cup customers, but we regard a provision that covers fully two-thirds of the subject matter in question as going far beyond protection against mere slippage.

**10.** As the district court stated in its memorandum opinion, Royal Cup's construction of the jury verdict—as netting out the $101,000.00 final payment and awarding additional damages of $96,600.00 (plus attorneys' fees of $33,000.00)— would mean that Royal Cup received "the territories, the covenant not to compete, the brewers

and the inventories for practically nothing." If JCS paid damages of $96,600.00 to Royal Cup, the relevant portion of JCS' business would have been transferred to Royal Cup for a total payment of $99,651.00:

| | |
|---|---:|
| Original deposit: | $ 50,000.00 |
| Payment at closing: | + 146,251.00 |
| Subtotal (payment prior to trial): | $196,251.00 |
| Less "damages": | − 96,600.00 |
| Total: | $ 99,651.00 |

(Royal Cup also paid JCS for inventory on hand at closing, but that transaction is not at issue here.)

was willing to pay a *further $500.00* for each additional validated account up to a total of 202 accounts. Thus, the recited purchase price of $297,251.00 did not reflect an "overvaluation" of a business that turned out to have fewer accounts than promised, as Royal Cup now claims. The price-reduction provision anticipated the overvaluation problem and did not bind Royal Cup to pay the stated figure if fewer than 310 accounts validated.

The contemplated exchange of money for customer accounts was expressed in terms of a total price minus deductions, as in (B) above, rather than in terms of a lower price plus payment of $500.00 for each account over 108, as in (A) above, but both variations represent the same bargain. JCS "promised" that it had 310 accounts as partial consideration for $297,251.00; this promise was qualified, however, by the "but if I don't have that many, I'll accept less money" proviso built into the contract. Thus, JCS may have broken the "promise" in which it stated that it had 310 active accounts, but it did not, indeed it could not, *breach the contract* by failing to deliver the full 310 accounts. And, since Royal Cup was not required to pay for the undelivered accounts, the broken promise could not *damage* Royal Cup. By contracting for a reduction of only $500.00 for each nonvalidating account between 108 and 310, Royal Cup may have made a bad bargain, but that was nonetheless the bargain it made.

### B.

We turn now to the jury's answers and to the district court's interpretation of those answers. The jury answered "yes" to Interrogatory No. 1 (did JCS breach the contract?) and "$96,600.00" to Interrogatory No. 2(a) (if the answer to No. 1 is "yes," what damages should be awarded to Royal Cup?). The jury explained, in its answer to Interrogatory No. 13, that its award was based on shortfalls in accounts and brewers; the amounts awarded, as the district court noted, corresponded to the sums yielded by applying the contract's price-reduction provisions to the number of nonvalidating accounts and undelivered brewers.

A court attempting to reconcile a jury's apparently inconsistent answers should, in determining whether those answers represent a logical and probable decision on the issues as submitted, refer to the entire case—pleadings, evidence, argument, jury instructions—and not just to the jury's answers themselves. *Griffin*, 471 F.2d at 916; *Wright v. Kroeger Corp.*, 422 F.2d 176, 178 (5th Cir.1970). Looking be-

Royal Cup retorts that it received "practically nothing." Yet the contract itself allocated *$172,250.00 for brewing equipment.* Even allowing for a deduction of $6,600.00 (the value of brewing equipment found missing by the jury), Royal Cup received $165,650.00 worth of brewing equipment alone—as measured by the *contract's* valuation of the equipment. Furthermore, according to the jury's determination that 180 accounts did not validate, Royal Cup also received 130 active accounts. Although the contract did not ascribe a value to customer accounts specifically (apart from the $1.00 for identifying marks, customers list, and good will), we can assume from the $500.00 price-reduction provision that each account was understood by both parties to be worth something. In exchange for its $196,251.00, then, Royal Cup received—*at minimum*—brewing equipment worth $165,650.00 and 130 accounts for $30,601.00 ($196,251.00 minus $165,650.00).

Royal Cup received more, however: a covenant not to compete valued in the contract at $125,000.00. Indeed, it is probable that the value of customer accounts was recognized in this provision, rather than in the $1.00 sum for identifying marks, customers list, and good will. Accepting Royal Cup's plausible assertion that a covenant not to compete for 310 customers is worth more than such a covenant covering only 130 customers, we note that the $500.00 price reductions for nonvalidating accounts were to come specifically from the $101,000.00 still owing and earmarked as being in exchange for the covenant not to compete. This means that, even if the number of nonvalidated accounts was so substantial that Royal Cup would have to pay none of the $101,000.00 balance on the covenant not to compete, Royal Cup had willingly paid $24,000.00 for a covenant not to compete covering as few as 108 accounts:

| Accounts | | Price | |
|---|---|---|---|
| 310 | | $125,000 | |
| –202 | ($101,000/500) | –101,000 | (maximum adjustment on covenant not to compete) |
| 108 | | $ 24,000 | |

yond the answers in this case, we note, first, that Royal Cup's complaint alleged that JCS had breached the contract "by *failing to deliver its assets* based upon the performance criteria expressly incorporated in the Purchase Agreement." (Emphasis added.) Then, at trial, Royal Cup executives testified that JCS had delivered fewer than 310 accounts and fewer than 370 brewers. Both JCS and Royal Cup elicited testimony and presented considerable documentary evidence on the number of validated accounts and on the actual number of brewers. In closing argument, JCS invited the jury to determine any shortfalls and charge them against the amount still owed on the purchase price. Royal Cup, no less than JCS, invoked the contractual price-reduction provision in closing argument by acknowledging that a set-off was contemplated for nonvalidated accounts and by demanding an offset, against the $101,-000.00 still unpaid, of $90,000.00 specifically for 180 such accounts. Thus, considering the case in its entirety, we conclude that the parties, by repeatedly putting the number of nonvalidated accounts and the quantity of undelivered brewing equipment at issue throughout the proceeding, in effect asked the jury for an *accounting* under the express provisions of the contract, as well as for a verdict on their fraud and contract claims. The jury gave the requested declaration in its answer to Interrogatory No. 13—not by stating the actual number of nonvalidated accounts or the number of undelivered brewers, but by applying the contractual price-reduction provisions to those numbers and coming up with a dollar amount for each. This answer represented a logical and probable decision on the issues submitted.

We must now analyze the jury's answers to Interrogatories No. 1 (did JCS breach the contract?) and No. 5 (did Royal Cup breach the contract?) to see if they represent an equally logical and probable, as well as consistent, decision on the issues. In "our concerted effort to reconcile every apparent inconsistency" in light of the entire case, we may be aided by "plausible" and "understandable" assumptions. *See Miller v. Royal Netherlands Steamship*

*Co.*, 508 F.2d 1103, 1106, 1107. (5th Cir. 1975). As explained in our discussion of the sale transaction represented by the contract, a seller who promises to deliver X assets in exchange for Y dollars may appear to break a promise when he delivers fewer than X assets. He does not, however, breach the contract when, in the contract itself, he has qualified his promise by agreeing to accept price reductions for each recited asset not in fact delivered. But as this case was presented to the jury, JCS' *failure to deliver 310 accounts and 370 brewers* was repeatedly characterized as a *breach of contract:* in Royal Cup's complaint, in trial testimony, in closing argument. The district court's instructions on the breach of contract claim did nothing to dispel that characterization. It is more than a plausible assumption—it is a virtually inescapable one—that the jury's answer to Interrogatory No. 1 was based on this identification of *breach of contract* with *failure to deliver the quantity of assets recited in the contract.* The jury's answer to Interrogatory No. 13 indicates conclusively its finding that JCS failed to deliver the full 310 accounts and 370 brewers. These two answers are thus rendered consistent given the jury's understanding, fostered by the parties' own presentation of the issues, that failure to deliver less than the recited quantity constituted a breach.

A corollary assumption explains and integrates the jury's answer to Interrogatory No. 5 that Royal Cup did not breach the contract. JCS had argued that Royal Cup's *failure to pay the remaining $101,-000.00* was a *breach.* The jury found that Royal Cup *did not owe* JCS $101,000.00 because of the shortfall in accounts and brewers, which triggered the contract's price-reduction provision. If it did not owe $101,000.00, its failure to pay that amount could not be considered a breach.

■ Our interpretation of the answers, based on our consideration of the entire case, draws further support from the specificity of the answers themselves. When examining a jury's answers with an eye to reconciling apparent inconsistencies, a court should consider not only the jury's

"categorical answers" (i.e., the yes-or-no responses or the bottom-line dollar figures) to the questions submitted, but also any specific explanation the jury offers for its answers. *See Griffin*, 471 F.2d at 916. The jury in this case gave precise explanations for (1) its award of $90,000.00 to Royal Cup—"for accounts not validated," and (2) its award to Royal Cup of $6,600.00 —"for unaccounted brewers." These explanations leave no room for doubt about the jury's understanding of what JCS "owed" to Royal Cup and why. That the interrogatory called for an itemization of "damages" rather than for an offset does not alter the clarity of the jury's intent, especially given the jury's understanding of "failure to deliver the recited quantity" as a "breach of contract."

■ Royal Cup correctly states that courts must go, and have gone, to great lengths to reconcile and hence to preserve a jury verdict, but, as we note above, a prerequisite of a court's efforts is that its reading of the jury's answers be fair and reasonable. *See Gallick*, 372 U.S. at 119, 83 S.Ct. at 666; *Toner*, 828 F.2d at 513. We agree with the district court that to read the answers as Royal Cup proposes would be neither fair nor reasonable. Royal Cup's solution results in an unfair windfall to Royal Cup: an outright payment of $96,600.00 out of JCS' pocket into Royal Cup's pocket, representing the amount by which Royal Cup overvalued the business when setting the contract price, *plus* discharge of Royal Cup's own obligation to pay the remaining $101,000.00 against which any shortfall in accounts was to be offset. This would mean that, in the words of the district court, Royal Cup would have received "the territories, the covenant not to compete, the brewers and the inventories for practically nothing." *See supra* note 10. Such a reading is also unreasonable, since the jury so precisely identified the shortfall in accounts and in brewers as the basis for its monetary award to Royal Cup and so obviously calculated the amount according to the specific contractual provision covering shortfalls. To reject the itemized $96,600.00 award as reflecting an accounting of assets delivered, and to read it instead as the jury's estimate of how much Royal Cup was "damaged" by overvaluing JCS' territories and paying an inflated purchase price (even after price reductions), is utterly unfounded.

We agree, instead, with the district court's interpretation of the jury's answers as reflecting the jury's application of the contract's set-off provision for shortfalls. We hold that the jury's answers, so interpreted, represent a logical and probable decision on the issues submitted and that the district court's judgment was based on a fair and reasonable reconciliation of those answers.

III.

With limited exceptions not applicable here, Alabama law permits the recovery of attorneys' fees "only where authorized by statute [or] when provided in a contract." *Shelby County Comm'n v. Smith*, 372 So.2d 1092, 1096 (Ala.1979). The contract between Royal Cup and JCS did provide for an award of attorneys' fees to the prevailing party in an action brought to compel compliance with the terms of the contract or to obtain damages for breach. The district court did not reach what it regarded as the difficult question of whether Royal Cup was a prevailing party. It held, instead, that the contract was ambiguous on the circumstances under which attorneys' fees could be awarded and that JCS had waived a jury finding on the issue. Given our interpretation of the jury verdict and our affirmance of the judgment entered on that verdict, we hold that the attorneys' fee provision was not ambiguous and that Royal Cup was not a prevailing party.

■ Whether a contract is ambiguous is a matter of law for the court to decide. *See Terry Cove North, Inc. v. Baldwin County Sewer Auth., Inc.*, 480 So.2d 1171, 1173 (Ala.1985). Our review of the district court's determination of that issue is therefore plenary. *See Cathbake Inv. Co. v. Fisk Elec. Co.*, 700 F.2d 654, 656 (11th Cir.1983).

The provision awarding attorneys' fees to the prevailing party "in any suit institut-

ed to compel compliance of the provisions of the agreement and/or to obtain damages for its breach" does not, in itself, appear ambiguous. The district court, however, anticipated an ambiguity in the provision's application if the jury were to find that both parties had breached the contract. Before submitting the special interrogatories to the jury, therefore, the court held a colloquy with counsel. It suggested that a special interrogatory be put to the jury, asking for a clarification of who was or was not entitled to attorneys' fees in the event of a verdict for *both* parties on the breach of contract claim. Counsel for JCS conceded that JCS no longer sought attorneys' fees even if it obtained a verdict in its favor, and, with respect to the proposed interrogatory, stated "[w]e have waived it now." Subsequently, when JCS moved to alter or amend the judgment to exclude the award of fees to Royal Cup because, under the judgment, Royal Cup was not a prevailing party, the district court denied the motion on the grounds that JCS had "waived a special verdict or finding" to clarify the circumstances under which fees could be awarded.

As we read the colloquy, JCS did not waive the contract's threshold requirement that only a prevailing party, when clearly ascertainable, may recover attorneys' fees. It did waive any right to recover attorneys' fees, and it waived a special interrogatory covering the potentially ambiguous "dual verdict" situation. This did not occur. Rather, as explained above, the jury found that JCS did not deliver the stated number of assets, but, by finding that Royal Cup was due an offset of $96,-600.00 against the remaining $101,000.00 payment, it implicitly recognized that the price-reduction provision was in force. Thus, according to the district court's fair and reasonable reconciliation of the apparently inconsistent jury answers, neither party was found to be in breach. Royal Cup is therefore not the "prevailing party" in a suit "to obtain damages for [the contract's] breach."

Royal Cup argues that, even if the district court's interpretation is correct and JCS did not breach the contract, Royal Cup is still entitled to attorneys' fees as a prevailing party in a suit to compel compliance with the terms of the contract. We disagree. JCS did comply by delivering a certain number of assets at closing. The contract contemplated a meeting between the parties, twelve weeks after closing and four weeks after the completion of the eight-week validation period. Royal Cup would present the number of accounts that failed to validate, and, if JCS agreed that the number was accurate, JCS would accept a final payment which reflected the contractually authorized deductions. This accounting did not take place, however, for, on the appointed day, Royal Cup filed suit instead. Royal Cup never tendered $4,400.00 to JCS—the amount still owed according to Royal Cup's own proof of the deficiencies in accounts and brewing equipment—for the assets already delivered. JCS never disputed Royal Cup's validation figures and never refused to accept a reduced payment *in compliance with the terms and conditions of the contract.* If Royal Cup had tendered $4,400.00 and, in response to JCS' refusal to accept only that amount, had filed suit seeking an accounting, and if that accounting had resulted in confirmation of the $4,400.00 figure, then Royal Cup would have been a prevailing party in its suit to compel JCS to comply with the terms of the contract. As it was, Royal Cup's suit to compel compliance with the price-reduction provision was premature, since compliance had not been withheld.

## IV.

Based on the foregoing reasons, we AFFIRM the $4,400.00 judgment in favor of JCS and REVERSE the award of attorneys' fees.

IT IS SO ORDERED.